**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| CYNTHIA GILBERT,<br><br>            Plaintiff,<br><br>    v.<br><br>**LIFE INSURANCE COMPANY OF**<br>**NORTH AMERICA,**<br><br>            Defendant. | Civil Action No.:  2:26-cv-4385<br><br>COMPLAINT FOR<br>    Failure to Provide Plan Benefits under<br>    29 U.S.C. §1132(a)(1)(B) |

**COMPLAINT FOR ACCIDENTAL DEATH INSURANCE BENEFITS UNDER ERISA**

COMES NOW the Plaintiff, CYNTHIA GILBERT, by and through the undersigned attorney, for his Complaint against Defendant, LIFE  INSURANCE  COMPANY OF NORTH AMERICA and alleges as follows:

**PARTIES**

1.      Plaintiff Cynthia Gilbert ("Gilbert" or "Plaintiff"), is a resident of Hamilton County, Tennessee, an employee of BlueCross BlueShield of Tennessee ("BCBS"") and the sole beneficiary of a Group Accident Policy No. OK 980531 (the "Policy") which insured the life of her dependent spouse, Charles Gilbert ("Decedent").

2.      Defendant Life Insurance Company of North America ("LINA" or "Defendant") is incorporated in Pennsylvania, maintains a principal place of business in Philadelphia, Pennsylvania and issued the Policy to Trustee of the Group Insurance Trust for Employers in the

1

Finance, Insurance and Real Estate Industry and its subscriber, BCBS.  The Policy is an employee welfare benefit policy within the meaning of the Employee Retirement Income Security Act ("ERISA"), as amended, 29 U.S.C. § 1001, et seq.

## JURISDICTION AND VENUE

3.    Pursuant to 29 U.S.C. §1132(e) and 28 U.S.C. § 1331, this Court has original subject matter jurisdiction because this Complaint arises under ERISA

5.    Pursuant to 29 U.S.C. §1132(e)(2), this Court has venue because Defendant LINA resides or may be found in this District.

## FACTUAL ALLEGATIONS

6.    At all relevant times, Gilbert was employed by BCBS and was a participant in the Group Accident  Policy. A copy of the  Policy is incorporated by reference under **Exhibit A.**

7.    The Policy provides voluntary accidental death and dismemberment ("AD&D") benefits to a "Covered Person" which includes BCBS eligible employees and their eligible Spouse. Pursuant to the Policy terms, premiums for voluntary spouse AD&D  coverage were paid through Gilbert's payroll deductions.

8.    Decedent was Gilbert's lawful spouse and a Covered Person under the Policy.

9.    Gilbert elected voluntary spouse AD&D coverage for Charles Gilbert in the amount of $100,000.00.

10.    Gilbert is the valid  sole beneficiary for benefits provided pursuant to the Policy.

11.    The Policy provides that accidental death benefits are payable if a "Covered Person" suffers a "Covered Loss resulting directly and independently of all other causes" from a Covered Accident.

12. The Policy defines "Covered Accident" as "a sudden, unforeseeable, external event" that results directly and independently of all other causes in a Covered Injury or Covered Loss, occurs while the Covered Person is insured, is not contributed to by disease, sickness, mental or bodily infirmity, and is not otherwise excluded.

13. The Policy defines "Covered Loss" as a loss that is the result, directly and independently of all other causes, of a Covered Accident, is one of the cove

14. The Policy contains an exclusion, as to which Defendant bears the burden of proof which negates payment of benefits for loss caused directly or indirectly, in whole or in part, by operating any type of vehicle while under the influence of alcohol, and defines "under the influence of alcohol" by reference to the law of the state in which the Covered Accident occurred.

15. Tennessee Law, T.C.A. § 55-10-401 provides that it is unlawful to drive or be in physical control of a motor vehicle on public roads, streets, alleys, or other premises generally frequented by the public at large while under the influence or with a blood alcohol concentration of 0.08% or more

16. On April 19, 2025, at approximately 11:34 a.m., Decedent suffered fatal injuries when his unoccupied Dodge Ram truck began rolling away from his property onto and across the cul-de-sac. In an effort to stop the vehicle before it struck a neighboring residence, Decedent ran beside the rolling truck with the driver's door open and placed his hands on the steering wheel. During that attempt, Decedent became pinned between the open driver's door and the garage wall of the neighboring residence.

17. Following the accident, deputies responded to the scene and found Decedent unresponsive and pinned between the truck's driver-side door and the garage wall and his body was partially in the vehicle and the door was pressed across his chest. Fire personnel used rescue

3

equipment, including winching the vehicle approximately one and one-half feet from the wall, to access and remove Decedent and attempt life-saving measures. EMS assisted with rescue and triage efforts and pronounced Decedent deceased at the scene at approximately 11:54 a.m. Decedent remained at the scene until the Medical Examiner arrived at 2:22 p.m. and officially pronounced death at 2:30 p.m., nearly three hours after the 11:34 a.m. 911 call, at which time the ambient temperature was recorded as 80°F.

18.    The Medical Examiner performed a scene investigation and external body examination finding Decedent's stomach was soft to palpation, his body had mottling to his arms and upper chest, and multiple contusions and peri mortem contusion to his chest and abdomen. The Medical Examiner listed the cause of death as "Blunt force compression of torso; Motor vehicle-pedestrian collision" and the manner of death as "Accident."

19.    Due to the traumatic injury, Decedent's body was transported to the Hamilton County Medical Examiner's Office where an autopsy was performed by pathologist Dr. Steven Cogswell on April 21, 2025 at 12:45 p.m.

20.    During the autopsy, impression mark, contusions and lacerations were noted but no x-rays were taken. The autopsy report notes that the body was not in a state of decomposition.

21.     The autopsy materials do not include any documented internal examination, including any opening of the abdominal cavity or evaluation of internal organs. The autopsy materials further contain no record of any internal assessment of decomposition or of conditions within the gastrointestinal tract capable of contributing to postmortem ethanol production.

22.    The autopsy indicates that postmortem heart blood was collected at approximately 1:35 p.m. on April 21, 2025, and submitted for testing at NMS Labs.

23.     NMS Labs testing of the postmortem sample yielded a result of 237 mg/dL ethanol and a reported BAC of 0.237 g/100 m/L.

24.     The Death Certificate lists the cause of death as "Blunt Force Compression of Torso" as a result of "Motor Vehicle -Pedestrian Collision" and the manner of death as "Accident," The Death Certificate also states that the injury occurred as a result of "Pinned in Door of Truck During Collision with Building."

25.     Following Decedent's death, Gilbert submitted a claim for AD&D benefits under the Policy. Defendant denied the benefit finding that Decedent's death was allegedly foreseeable and therefore not a Covered Accident, and that the alcohol-related exclusion allegedly applied.

26.     In issuing its initial denial, Defendant relied on the toxicology report, autopsy and medical examiner's investigation and the opinion of its retained consultant, Dr. Frederick Fochtman, who opined that the postmortem BAC accurately reflected the decedent's ante-mortem BAC and that no postmortem ethanol production occurred because the medical examiner found no decomposition and no evidence of elevated glucose.

27.     Dr. Fochtman assumed that the medical examiner's finding of no decomposition meant there was no production of ethanol during the postmortem interval

28.     Gilbert timely appealed the denial and submitted evidence that the postmortem ethanol result was unreliable to establish what Decedent's antemortem BAC level was at the time of the incident. The appeal asserted that Decedent had not consumed enough alcohol to account for the reported BAC.

29.     Gilbert submitted evidence of Ring camera video taken shortly before the accident to support that Decedent was not intoxicated at the time of death.

30.     Gilbert's appeal argued that the postmortem heart-blood sample was an unreliable measurement of BAC at the time of the accident because Decedent sustained blunt-force compression of the torso, his body was exposed to 86-degree heat for approximately four hours, more than 48 hours elapsed before blood sampling and medical records showed Decedent had high blood glucose, all of which made the sample susceptible to postmortem ethanol production, fermentation/bacterial or fungal activity, contamination from gastrointestinal contents, and postmortem redistribution.

31.     Defendant denied Gilbert's appeal by relying on the opinion of Dr. Marvin Pietruszka, who opined that the toxicology result was a reliable reflection of Decedent's BAC level at the time of death because the medical examiner found no decomposition, no abdominal rupture, and no conditions that would promote postmortem ethanol production.

32.     The medical examiner records cited in the claim file document an external scene/body examination and note multiple chest and abdominal contusions, a soft abdomen to palpation, and no visible decomposition, but they do not they do not rule out an abdominal rupture and do not document an internal abdominal or gastrointestinal examination.

33.     Defendant concluded on appeal that Charles Gilbert's death was the foreseeable result of his voluntary actions and not a Covered Accident, and that the Policy exclusion for operating a vehicle while under the influence of alcohol applied.

34.     With respect to the claims made herein, Plaintiff has exhausted his administrative remedies available to her under the Policy.

35.     As of the date of this Complaint, Defendant has failed to pay Plaintiff sums due pursuant to the terms of the Policy.

## COUNT I

**(Action for Plan Benefits 29 U.S.C. §1132(a)(1)(B))**

36.    Plaintiff incorporates the allegations contained in paragraphs 1 through 35 above, and further states:

37.    Decedent was a Covered Person under the Policy at the time of his death.

38.    Decedent suffered a Covered Loss because he died from blunt force compression of the torso due to a motor vehicle-pedestrian collision, and the death certificate classified the manner of death as accidental.

39.    The official investigative records also support that the death was accidental. Detective Kurtz reported that Dr. Cogswell did not see injuries that would make the death anything other than an accident, and the Sheriff's Office later closed the case as an accidental death.

40.    Plaintiff has fulfilled all conditions for receipt of benefits under the Policy and has presented such evidence to Defendant.

41.    Defendant has made unsupported factual conclusions and has misconstrued the terms of the Policy.

42.    Defendant failed to reasonably establish that the alcohol-related exclusion applies because its conclusion depended on a disputed postmortem heart-blood BAC and assumptions about ante-mortem intoxication, causation, and postmortem ethanol production that were challenged by Plaintiff during the administrative appeal.

43.    Defendant failed to reasonably address Plaintiff's evidence that the postmortem BAC was unreliable, including evidence of blunt-force torso trauma, delayed postmortem blood collection, heat exposure, elevated glucose/A1C, liver disease, and Ring camera evidence that Plaintiff contended showed Charles Gilbert was not visibly intoxicated shortly before the accident.

44.    Defendant failed to reasonably establish that Decedent was operating a vehicle while under the influence of alcohol within the meaning of the policy and applicable Tennessee law, as opposed to attempting to stop or regain control of a rolling vehicle during an emergency.

45.    Defendant failed to reasonably establish that any alleged intoxication directly or indirectly caused, in whole or in part, Decedent's death.

46.    Defendant's denial was not supported by a full and fair review of the administrative record.

47.    Defendant's denial was based on selective reliance on evidence favorable to denial, including the postmortem BAC, while minimizing or rejecting contrary evidence submitted by Plaintiff.

48.    Defendant's denial was based on conclusory consultant opinions that did not adequately reconcile the limitations of the medical examiner's records with Plaintiff's appeal evidence.

49.    Defendant's denial improperly treated the absence of documented internal findings in the medical examiner records as affirmative proof that no internal trauma, contamination, redistribution, or ethanol-producing process existed.

50.    Defendant's denial was contrary to the terms of the Policy and contrary to the evidence submitted in support of Plaintiff's claim and appeal.

51.    To the extent discretionary review applies, Defendant's denial was arbitrary and capricious because it was not the product of a reasoned, deliberate, and principled decision-making process supported by substantial evidence.

52.    Defendant's denial of Plaintiff's claim for benefits is based on a structural conflict of interest because Defendant both determined eligibility for benefits and was financially

8

responsible for paying benefits under the Policy and because Defendant had fiduciary obligations to plan participants when determining claims under the Policy and an interest in maximizing its own profitability.

53.    As a result of Defendant's wrongful and unreasonable denial, Plaintiff has been deprived of AD&D benefits in the amount of $100,000, plus interest, attorney's fees and costs.

54.    Plaintiff is entitled to recover benefits due under the Policy pursuant to 29 U.S.C. § 1132(a)(1)(B).

55.    Plaintiff has incurred, and will continue to incur, attorneys' fees, costs, and expenses in bringing and prosecuting this action. Plaintiff is entitled to an award of such attorneys' fees, costs, and expenses pursuant to 29 U.S.C. § 1132(g).

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor, and against Defendant by entering judgment requiring Defendant to pay Plaintiff all benefits due under the Policy, commencing with the first day such benefits were due and continuing through the date of judgment, for pre- and post-judgment interest to the maximum extent allowed by law, for her attorneys' fees, cost, and expenses and such other and further relief as is just and proper.

Dated this 25th Day of June 2026.

Respectfully,

MORGAN & MORGAN,

*/s/ Jo-Ellen Levy*
Jo-Ellen Levy (SBN# 066785)
MORGAN & MORGAN
570 Crown Oak Centre Drive
Longwood, FL 32750
Telephone: (215) 861-0498
Facsimile: (215) 861-0523

9

Email: joellenlevy@forthepeople.com
Attorney for the Plaintiff

*Attorney for Plaintiff*